### FLAD v. MURPHYSBORO & S. I. RY. CO.

(Circuit Court of Appeals, Seventh Circuit. April 11, 1922.)

No. 3041.

**1. Contracts ⬅⇒214—Railroad held "completed" when in operation.**

By a contract between the parties plaintiff was employed as engineer and to assist in financing a projected interurban railway for a commission on the cost; the contract providing that, if money for construction was not obtained within 90 days after franchises, etc., had been secured, defendant might cancel the contract, but in such case, if the road was built within 5 years defendant should pay plaintiff $2,500 within 90 days "after the completion of said line of railway." After plaintiff had rendered considerable service, notice of cancellation was given. *Held* that, on completion of the road within the 5 years, sufficiently so that it had been continuously operated for several months in the public service, plaintiff was entitled to the $2,500, though certain work, such as the building of stations, ballasting, etc., remained to be done.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Complete—Completion.]

**2. Appeal and error ⬅⇒999(1)—Finding by jury on undisputed facts reviewable.**

Where the evidence is undisputed, a finding by a jury that a railroad had not been completed within the meaning of a contract may be reviewed by the appellate court.

**3. Contracts ⬅⇒214—Provision held not to create a condition precedent to suit thereon.**

That a contract by which plaintiff was entitled to receive a payment within 90 days after completion of a railroad, if within 5 years, further provided that, in case of plaintiff's death within 5 years after date of the contract, defendant should be released therefrom, *held* not to require plaintiff to wait until the expiration of 5 years before bringing suit, where the road was completed within 3 years.

---

⬅⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the Eastern District of Illinois.

Action at law by Edward Flad against the Murphysboro & Southern Illinois Railway Company. Judgment for defendant, and plaintiff brings error. Reversed and remanded.

It appears that a number of individuals residing in or about Carbondale or Murphysboro, Ill., undertook to construct an electric road of about eight miles connecting those places. They organized the Murphysboro & Southern Illinois Railway Company, and had several surveys made. Under date of May 16, 1914, they entered into a written agreement with plaintiff in error Flad, whereby he was employed by the company to act as consulting and constructing engineer "in connection with the financing and construction of said railway." Flad agreed to check over the surveys and test the accuracy of the plans theretofore made by others, and make such further surveys and plans as were necessary, and to assist the company in obtaining the necessary capital to build the road, and to advertise its securities necessary to be sold to procure capital to build it, and carry on correspondence and negotiations with other parties in regard to the sale of the securities, and in arranging for bond and stock issues. He agreed to take charge of and supervise the construction, and the contracts for materials therefor, and to make necessary estimates and inspections. On making the check of the surveys and estimates he was to receive $350 and such other actual engineering expenses as he had incurred, and his total compensation for his services, including such outlay, was to be a commission of 12 per cent. of the cost of material and labor used in constructing and equipping the road. The parts of the contract most material to the issues here are:

"It is further agreed that the party of the first part shall make all reasonable efforts to get suitable franchises permitting the construction and operaion of said road in the cities of Murphysboro and Carbondale and also to obtain the approval and permission of the Public Utilities Commission of the state of Illinois allowing the construction and operation of said line and the issuance of the securities necessary to obtain the capital necessary for the construction of said line; and it is expressly provided that, if the party of the first part are unable to secure such permit, approval, or satisfactory franchises, and is prevented from constructing the said railway on account thereof, then it shall not be liable to the party of the second part for said commission, even if the necessary money is procured for the construction of said road.

"Payment of such commission shall be made to party of the second part from time to time sufficient to cover the expenses authorized by the party of the first part. When construction commences, the party of the second part shall receive its commission on the cost of materials, construction, and equipment of the road on monthly estimates of work done and material and equipment furnished: Provided, that the party of the first part shall retain 20 per cent. of the commission of the party of the second part until the time the said line of road between Murphysboro and Carbondale is constructed and equipped ready for operation.

"Eighth. It is further expressly agreed that, if the necessary money for the construction of said line of railway is not secured with 90 days after franchises in Murphysboro and Carbondale and approval and permission of the Public Utilities Commission, as referred to in section 7 above, have been obtained, the party of the first part shall have the right to cancel this contract, by giving 30 days' written notice, upon the following terms:

"First. It shall give to the party of the second part a written notice that such money has not been secured, and that, if not so secured within 30 days from date of said notice, it desires to exercise its option to cancel this contract.

"Second. The said sum of $350 above mentioned, also all payments made to cover authorized expenses, shall, even if this contract is canceled, belong to and remain the money of the party of the second part:

"Third. It is further agreed that, if the party of the first part exercises its

option and cancels this contract, and the said line of railway between Murphysboro and Carbondale is, within 5 years from the date hereof, constructed by the party of the first part, its successors or assigns, then the party of the first part shall pay to the party of the second part, within 90 days after the completion of said line of railway, the sum of $2,500 in addition to authorize expenses as above provided in full compensation for services rendered by it under this contract: Provided, if the party of the second part shall be employed as consulting and constructing engineer, then the said $2,500 above mentioned shall apply on his compensation: And provided, further, should the party of the second part die within said 5 years, then the party of the first part shall be discharged from payment of said $2,500."

Flad checked over the surveys, plans, and estimates, and incurred some engineering and surveying expense, which, with the $350 provided for, was paid him. Franchises were duly obtained from the two cities and the Public Utilities Commission, on application, issued its certificate of convenience and necessity. A formal authorization for issue of bonds was not given by the board, but in conversation with one of its members and its chief accountant the president of the road was informed that the formal authorization could not be given at that stage of the proceeding, but would have to await more definite and tangible progress of the enterprise. No progress was made in the financing of the proposition, and the matter dragged along for 2 years or more, without anything tangible being accomplished. There was occasional correspondence and conversation between Flad and officials of the road, and under date of September 20, 1916, Minton, one of the projectors and stockholders and president of the company, wrote Flad a letter saying: "Complying with the terms of our contract, we herewith hand you notice of our desire to cancel same, with the understanding, of course, that we are to pay you $2,500 within 90 days after the road is complete, if done within the 5 years. I am quite sure you can appreciate the cost of this matter, and I am not sure yet that the matter is finally closed as to the completing of the railroad, but everything on some kind of a proposition that will result in its being built. I want to say to you that this company has the very kindliest feeling for you and an extreme high regard for your ability, and hope at some future time to be able to give you some work in our line."

In September, 1916, and for some time prior, another engineer, Davis, and a contractor, were figuring upon the financing and building of the road, and at the time the notice was given the details of a building contract had been talked over, followed by the execution of such a contract of date October 24, 1916, whereby this contractor was to grade the road and lay the rails for about $140,000. No securities of the company could be floated, and an arrangement was entered into whereby a St. Louis bank would advance the money on the notes guaranteed by the five stockholders of the company. Upon this arrangement this contractor proceeded with his work, and this was followed by contracts with others for the poles and overhead work for a trolley road and the equipment, which involved further expenditure of about an equal amount as the first contract, and for several months thereafter there was no provision made for raising money for the other work. But this was afterwards done by the individual stockholders borrowing money on their own credit in various Southern Illinois banks and building associations, and pledging their own credit and resources for its repayment. But no securities of the railroad were issued or arranged for until about 1918, when a bond issue was made which they were not able to negotiate. September 1, 1917, the road began operation between the two cities, and it has since continued in regular operation.

After Flad received Minton's letter of September 20, 1916, and inclosing the written notice, he wrote Minton under date of November 7, 1916, protesting against the cancellation of his contract and insisting upon his rights thereunder. The suit was upon the contract; the plaintiff claiming 12½ per cent. commission on about $250,000 of expenditure, less several deductions for expenses paid, and for estimated outlay of his completing the contract—his demand being about $23,000. A verdict for the company was set aside, and a new trial granted by the District Court, which again resulted in a verdict for the company, whereon was rendered the judgment here assailed.

C. E. Pope, of East St. Louis, Ill., for plaintiff in error.
Otis F. Glenn, of Murphysboro, Ill., for defendant in error.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

ALSCHULER, Circuit Judge (after stating the facts as above). The main contention here is that the so-called notice of cancellation was not authorized by the contract, because up to that time the Public Utilities Commission had not authorized the issue of securities as specified in section 7. The other conditions in the contract all existed—the franchises from the two cities, and the permission from the State Utilities Commission to construct the road. Permission to issue securities had not been obtained, but it was definitely learned that progress in the actual work would have to be made before the commission would grant this, and of this Flad was advised, and he well knew this was the situation for about 2 years, and what work he did thereafter was with knowledge of this fact. While he was not under obligation to procure the capital, he was nevertheless, under the contract, the financial consultant and assistant in its procurement. While it was not likely securities could ultimately be issued without such authorization. this would not prevent negotiation for the placing of securities at such time when they might be issued; indeed, section 7 of the contract contemplated the possibility of the money being raised even without the authorization of the commission to build the road, in which no commission was to be paid.

Defendant in error contends that the evidence shows an abandonment of the contract by Flad, but we cannot find that the evidence warrants this conclusion. The long inaction of Flad with reference to the financing of the railroad, while not necessarily showing abandonment of the contract, would have a bearing on the proposition whether his conduct after the giving of the notice would indicate an acquiescence in the terms of the notice, as a sufficient cancellation of the contract under section 8. Far more than the 90 days had passed since the coming into existence of the conditions referred to, and the funds to construct the line had not been raised under section 8. After the giving of the notice, 30 days yet remained in which to raise it before the cancellation would become effective; but Flad, with his attention sharply challenged to the situation, appears to have made no move whatever within that period, either to raise the money or to make any claim or contention respecting the notice, and nearly another month passed after the expiration of these 30 days before he took any definite stand with reference to the notice. There is evidence that he knew others were working on the proposition, and there was evidence that, shortly after expiration of the 30-day period following the notice, the contract was entered into for the construction of the roadbed.

It thus became an important question in the case whether or not, under the circumstances, with the knowledge of Flad that the projectors were extremely anxious to build this road, and Flad's inability to render assistance in financing it had long been manifest, Flad's conduct did not indicate acquiescence in the terms of the letter and notice of September 20, 1916, both of which may be considered as constituting

the notice. This was in effect an issue before the jury, whereon they found against Flad, and we cannot say there was no evidence to support such a finding. While section 8 refers to a cancellation of the contract, it would not be a cancellation under the terms of the section, but rather a termination of one phase of it, and the bringing into existence another, viz. those parts of the section which fix the rights of the parties in the event of the giving of the notice.

[1] Concluding, as we must, under the record, that the jury was not unwarranted in finding that Flad acquiesced in the notice, we are brought to a consideration of the then contractual relations of the parties. Subsequent parts of section 8 provide that, in case of exercise of the "right to cancel," Flad shall retain the $350, and other payments to him to cover expenses as provided in the contract, and that, if "the line of railway between Murphysboro and Carbondale is within 5 years from the date hereof constructed by the party of the first part, * * * then the party of the first part shall pay to the party of the second part within 90 days after completion of said line of railway the sum of $2,500 * * * in full compensation for services rendered by it * * * under this contract." Flad's right to the $2,500 is thus made dependent on building the line of road between the two cities within 5 years from the date of the contract, viz. by May 16, 1919. Defendant in error asserts that the line was not so completed at the time suit was commenced April 13, 1918, and upon the evidence submitted it may be said the jury's verdict would indicate that the jury found as a fact it had not been completed.

[2] If the finding reached was upon contradictory evidence upon that subject, we would have no right to disturb it. But it seems there was no controversy as to the facts bearing on this question, and we are at liberty to take the uncontroverted facts and from them determine whether there was such completion as was contemplated by the contract. The road was in continuous operation between its contemplated termini over 7 months before the suit was begun. It was regularly serving the public and discharging its duties as a common carrier. As in the case with all such utilities, new or old, but particularly new, there is always something yet to be done whereby the service may be improved. It is contended that the ordinances of the two cities required the construction of depots. But may it be said that "the line of railway" is not constructed between the cities because these depots had not yet been built? The terminal facilities necessarily in actual use may be crude, and far from such as are ultimately contemplated; but they are terminal facilities just the same, and the fact that at some time in the future, either through obligation or choice, the company will erect depots, more imposing and commodious than such as were in fact serving the public, does not warrant the conclusion that the line of railway is not completed and in operation. It is said, also, that there were fences yet to be built in order to comply with the state law; but this does not indicate that the line of railway was not constructed "by the party of the first part" within the meaning of the contract. It is said there is no building to hold the cars when not in use. But how many railroads there are, long in operation, whose passenger cars, when not

in use, remain in the open? It is a common sight. And the lack of ballast in parts of the road evidently is not such as to interfere with regular operation. No doubt every new road, and many old ones for that matter, require ballast, either initially or by way of renewal.

As against this contract, all such things are unimportant in the face of the controlling fact that the road was in actual operation as a public carrier of passengers, which presumably would not be permitted by the public authorities if it were lacking in any substantial respects whereby the traffic would not be reasonably safe or proper. As to this insistence of defendant in error, no fine line can be drawn in its favor to relieve it from such a liability whereby in its very operation of the road it holds itself out to have constructed a line of railway between the two cities sufficiently complete to serve the public, and receive the remuneration resulting from the service. If this road was sufficiently complete to be operated and receive revenue, it was sufficiently complete to raise an obligation to make the payment in the contract provided to be made upon the contingency of the completion of the line.

[3] Giving defendant in error the benefit of all its contentions of fact on this subject, it would follow as a matter of law that plaintiff in error was entitled to this amount, unless, as is further contended, he is in this action barred by the contract proviso:

"Should the party of the second part die within said 5 years, then the party of the first part shall be discharged from the payment of said $2,500."

The "said 5 years" refers to the 5 years following the making of the contract in 1914, and it is the contention of defendant in error that in no event would this become due until the expiration of such 5 years, and that this suit, brought in 1918, was premature as to any demand for the $2,500. The provision is a peculiar one, and it is not entirely clear what was intended by it. But under it, if Flad died within the 5-year period, and before the road was constructed, no right to the $2,500 would accrue, notwithstanding the road was in fact constructed within the 5 years. This would give effect to the clause, but in case the road is completed in Flad's lifetime and within the 5-year period, we do not regard the clause as postponing the maturity of the $2,500 until the 5-year period has ended, to await the contingency of Flad then living. While this seems to us the proper construction to be given that clause, nevertheless, if it is uncertain and ambiguous in this respect, we are justified in adopting the construction which defendant in error placed upon it in its letter of September 20, 1916, wherein it was unqualifiedly stated that the $2,500 was to be paid within 90 days after completion of the road, if done within 5 years.

If Flad is held to acquiescence in the cancellation claimed to have been effected by the letter and notice, surely his acquiescence was upon the terms therein stated. Respecting this part of the contract it was error to charge the jury, as was done, that if the contract was canceled according to its terms suit for the $2,500 would be premature if brought less than 5 years from the date of the contract, and to submit to the jury the question of whether the road had been constructed at time suit was brought. As to this issue, the court, upon the facts of

this record, should have directed a verdict for appellant for $2,500, with interest at 5 per cent. per annum from date of suit, and on like state of facts thereon such will be its duty.

The judgment is reversed, and the cause remanded.